

The following constitutes the order of the Court.
Signed: August 29, 2022

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>RAYMOND WON BAE,<br><br>          Debtor. | Case No.  19-40959 CN<br>Chapter 7 |
| RANDALL R. FULLER, DARIUS ORAVEC AND JOO-YOUNG KIM,<br><br>          Plaintiffs,<br><br>v.<br><br>RAYMOND WON BAE,<br><br>          Defendant. | Adversary No.  19-4032 CN<br><br>**MEMORANDUM DECISION** |

On May 9, 10 and 11, 2022, this court conducted a trial in the above captioned adversary proceeding.  All appearances were noted on the record.  The following constitutes this court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

In 2012 and 2013, plaintiffs Randall Fuller, Darius Oravec and Joo-Young Kim (collectively, "Plaintiffs") were enticed by defendant Raymond Won Bae to invest substantial funds in INB, Inc., a South Korean startup with a business plan to fabricate "ultra high tech" circuit boards in South Korea for the South Korean and American markets. The Plaintiffs – all of whom knew Bae personally and/or professionally before

they invested – approached their investments from different perspectives. Oravec was strictly a passive investor in INB, and his investment was a pure profit play. Fuller and Kim, who have held various positions in the semi-conductor industry, became more involved in INB's operations after they invested, and they were eventually employed by INB or an INB affiliate in South Korea. Notwithstanding their different investment strategies, all three lost their investments when INB ceased operating in 2015. The question before this court is whether their losses were simply the unfortunate by-product of a well-intentioned but chaotically run start-up or the result of fraudulent representations by Bae, INB's CEO, founder, and largest shareholder.

The parties spent a substantial amount of trial time describing INB's operations, financing, and relationship with certain affiliates. While such information can be significant in investment fraud cases, the evidence presented here was incomplete at best. For example, this court is still unsure how INB was financed, and the parties' efforts to describe the relationship between INB and several other Bae owned entities fell short. If nothing else, the trial demonstrated the precarious nature of investing in Silicon Valley-like start-ups. Regardless, Bae, who was an experienced Silicon Valley entrepreneur, formed INB in 2011 to manufacture specialty circuit boards, a niche field which he believed was underserved. Bae owned and operated RB Technology, a Fremont, California company that purchased circuit board components and did substantial business in South Korea. He believed that there was an undeveloped market for high end circuit boards, and he began discussing his concept with several persons in 2011, including some of the Plaintiffs. Plaintiffs do not dispute that Bae's concept was worthwhile, and they believed that he had the business experience and acumen to lead INB. Bae believed that he needed approximately eight million dollars to properly capitalize INB's initial operations. He began soliciting investments from friends and business associates in 2011 and ultimately developed and presented a business plan to potential investors, including Plaintiffs.[1] While

---

[1] Bae solicited investments by discussing INB with friends, RB Technology

Bae drafted at least two business plans, the first, dated January 23, 2012, was the one Bae presented to Plaintiffs before they invested (the "January 2012 Plan"). The January 2012 Plan explained INB's business goals, listed financial and manufacturing milestones that it hoped to accomplish, provided economic projections describing the anticipated market for its product, named some of its management team, and stated the names of several parties who had purportedly invested substantial sums in INB.

At trial, Bae downplayed the significance of the January 2012 Plan and described it as a "work in progress." He correctly noted that over the next three years INB's business plans and timelines changed while it struggled to build its manufacturing plant, purchase the correct equipment, and train its employees before it terminated its operations in December 2015. While the January 2012 Plan presumably was Bae's best efforts to describe INB's prospects, its representations regarding INB's management team, existing investors, and current capitalization were not conjecture or prognostications. For example, the January 2012 Plan stated that INB's "current ownership" included Bae and Vijay Israni (an apparently well-known businessman with a good track record of investing in Silicon Valley startups) who each owned 40% of INB's shares and had "invested heavily in the company." The January 2012 Plan's Valuation and Investment Analysis stated that the company's "initial investment" was eight million dollars, allowing potential investors to surmise that Israni (and Bae) had invested substantial funds in the venture.

The January 2012 Plan's references to Israni as an investor, principal, and advisor were incorrect. While Bae testified that he discussed INB with Israni in 2011, Israni informed Bae in or around December 2011/January 2012 that he was not interested in investing in INB. Moreover, while the January 2012 Plan indicated that Bae had poured millions of dollars into INB, the only evidence regarding the scope of his investment was Bae's insistence that he had done so. Bae repeatedly testified that his investment included

---

customers and vendors, and other individuals associated with these friends, customers, and vendors. Bae estimated that he talked to a hundred people about INB, thirty of which also reviewed the business plan.

personal funds and monies contributed by RB Technology, Inc. Unfortunately, no party introduced any documentary evidence establishing exactly how much Bae invested, and, perhaps more significantly, exactly how much money INB had in the bank at any moment in time.

Bae's plans for INB never came to fruition. INB's employees struggled to operate the equipment needed to manufacture the circuit boards, and the equipment that INB purchased – whether new or from a defunct Israeli business – was initially inadequate for the task. These factors dramatically delayed the business's operations, and despite borrowing substantial funds from a South Korean bank, INB ceased operations in 2015. As more fully discussed below, Fuller, Oravec and Kim did not receive any return on their investments.

**Oravec**

Oravec and Bae were business acquaintances and friends, and he respected Bae's business acumen and trusted him. Oravec was familiar with the circuit board industry, and he agreed with Bae that a niche circuit board manufacturer such as INB could be profitable. Bae began discussing INB with Oravec in 2011 and it appears that Oravec initially committed to investing $150,000.00 in INB before he reviewed the January 2012 Plan. In yet another of its misstatements, the January 2012 Plan represented that Oravec had already invested this amount well before INB received any funds from him. Oravec was nonplussed by this error during his direct and cross-examinations. While he initially informed Bae that he was interested in investing the requisite $150,000 (the January 2012 Plan indicated that INB was looking for investors who would invest that minimum amount), Oravec was only able to invest $85,000, which he provided to Bae in two tranches in the summer of 2012. Oravec first gave Bae a $40,000.00 check made payable to Bae or RB Technology, and he later, at Bae's instruction, deposited an additional $45,000.00 into a South Korean bank account that Oravec opened for this purpose. Oravec testified that he established this account in his name and that he did not know how or who withdrew these

funds. Regardless, INB acknowledged that he had invested $85,000 with it. Oravec also traveled with Bae to South Korea before he invested to get a better sense of INB's potential.

Oravec testified that Bae informed him that Israni was investing in INB during their initial discussions, and that his review of the January 2012 Plan further disclosed that Israni was a 40% investor and an advisor to the company. Oravec stated that he knew that Israni had successfully invested in other start-ups. While Plaintiffs' counsel guided Oravec through various sections of the January 2012 Plan to elicit his understanding of its terms, Oravec stated that he did not crunch any of its numbers before investing or focus on the January 2012 Plan's projections; instead, he was impressed by Israni's involvement and investment, trusted Bae, and believed that Bae's expertise and experience would turn INB into a profitable business.

**Kim**

Kim invested $300,000 in INB in January 2013 for a two percent equity interest in the company. Kim was a circuit design engineer by trade and had no experience in printed circuit board fabrication. Regardless, he was not strictly a passive investor in INB. Bae also owned/controlled Ara Technology, Inc., a South Korean based company that distributed circuit boards and certain raw materials which it purchased from RB Technology. Bae explained to Kim that he wanted to expand Ara Technology's business and use it (as disclosed in the January 2012 Plan) to market INB's product. Bae informed Kim that INB required his full attention and that he needed a CEO for Ara Technology. He offered the position to Kim, with one condition: that he invest $300,000 in INB. Kim accepted these terms and moved to South Korea to assume the CEO position.[2] Kim made his investment on January 15, 2013 by depositing $300,000 into RB Technology's HSBC account.

---

[2] The parties agreed that Kim would have an annual salary of $180,000 and receive a 20% equity position in Ara Technology along with a percentage of its annual dividends. Kim served as Ara's CEO from early 2013 to mid-2016, and he received his full salary during this time. Because of their intertwined finances, Ara Technology closed its doors in May 2016, a few months after INB's demise.

Kim testified that Bae approached him regarding INB in late 2012 and that he reviewed the January 2012 Plan at that time; he invested in INB a few months later. Kim also visited INB's South Korean worksite and saw that work was progressing on its manufacturing plant. Kim had experience drafting business plans, and he understood that the January 2012 Plan's projections may have been overly optimistic. He testified, however, that he was more interested in how its financial projections were going to trend. Kim stated that he invested in INB because of: a) Bae's expertise in the field, b) the investors listed in the January 2012 Plan, including Israni and Bae, who both had experience in the circuit board industry (Kim understood that Israni and Bae both owned 40% of the company), c) Bae's verbal representation that INB was worth $15 million, d) his visit to INB's (then under construction) business facility, and e) his opportunity to become ARA Technology's CEO. He testified that while he wanted the CEO position, his $300,000 investment was fundamentally premised on INB's opportunity to become a successful company.[3]

Kim's relationship with Bae soured after he became Ara Technology's CEO. Kim testified that despite his CEO title his job was primarily limited to marketing while Bae controlled Ara Technology's finances.[4] Kim stated that Bae regularly ordered Ara Technology's accountant to transfer funds to INB to address INB's cash needs, and that Ara Technology was forced to guaranty INB's substantial "leasing loan." Ara Technology eventually sued INB in South Korea to recover the transferred funds, and it obtained a substantial, but uncollectible, judgment. Ara Technology closed in May 2016, a few months after INB terminated its operations.

---

[3] Bae purportedly drafted a second INB business plan in February 2012. This plan omitted all references to Israni. Kim did not recall reviewing the second business plan before he invested in INB. Oravec also testified that he did not review the February 2012 plan before he invested in INB. The evidence indicated that this second business plan may have been drafted in 2014.

[4] There was no testimony regarding what representations Bae made to Kim regarding the CEO position.

**Fuller**

Fuller invested $300,000 in INB in April 2012 for a two percent equity interest. Fuller was an experienced Silicon Valley businessman who had known Bae both personally and professionally for several years before his INB investment. Fuller testified that he and Bae both believed that a South Korea based specialty circuit board manufacturer could be very profitable, and they had generally discussed the merits of such a venture before Bae approached him regarding INB. Fuller reviewed the January 2012 Plan more carefully that Oravec and Kim, and he was also more familiar with this aspect of the semi-conductor industry. He therefore read the January 2012 Plan with an experienced eye.[5] He testified that he reviewed the January 2012 Plan and believed that INB was a sound business concept that was adequately capitalized. He stated that he relied on its representations regarding the identify of its two significant investors – Israni and Bae – and the January 2012 Plan's statement that they had "heavily invested" in the company. Fuller calculated that Israni must have invested six million dollars to obtain his 40% interest.[6] He also testified that he relied on the balance sheet information contained in the January 2012 Plan, which indicated that INB had at least eight million dollars in the bank and net working capital of more than nine million dollars. He also noted that Oravec had also invested $150,000. While Fuller believed that Israni had a good track record with Silicon Valley start-ups, it was the amount of Israni's alleged investment, and not his advisory role, that interested him.[7]

A closer scrutiny of the January 2012 Plan may have raised some red flags. Fuller calculated that Israni had invested six million dollars to obtain his 40% interest in INB. Since Bae also owned 40%, Fuller should have surmised that Bae, too, had paid six million

---

[5] Fuller testified that he did not review the February 2012 Plan before he invested.

[6] The January 2012 Plan stated that the remaining 20% of INB equity would be sold for $150,000 for each one percent interest. Fuller therefore concluded that Israni paid six million dollars for his 40% interest.

[7] While Fuller testified that he thought Israni's experience could help a start-up succeed, Plaintiffs did not introduce any evidence regarding Israni's business experience or investment expertise.

dollars for his ownership interest. Yet the January 2012 Plan indicated that INB had only received eight million dollars in "paid in capital," which, as Bae would concede, was also an overstatement. In addition, the January 2012 Plan was incomplete (INB had not filled several important executive level positions), listed Fuller as a "Material Process Advisor" well before he was retained by INB, and contained confusing milestone dates.

Fuller acknowledged the January 2012 Plan's flaws and indicated that they did not dissuade him from investing. He also testified that Bae may have informed him that his business plan would describe Fuller as a business advisor. Fuller, who had informally advised Bae regarding INB for some time, assented to this language.[8]

Fuller reviewed the January 2012 Plan on January 28, 2012, committed to investing in INB in late March 2012, and invested his $300,000 on April 20, 2012 by depositing his funds into RB Technology's HSBC bank account. In May 2012, INB asked Fuller to serve as its vice president of manufacturing. He accepted the offer in July 2012 and moved to South Korea in September 2012 to address INB's stalled manufacturing efforts. Fuller testified that INB (*i.e.*, Bae) was generally plagued by "inattention to detail" regarding what equipment it needed, how to install the equipment, and what training and experience its employees needed to successfully manage its manufacturing process, and he believes that these issues contributed to INB's demise. INB fired Fuller in mid-2013.

**Bae**

Bae generally testified regarding INB's origin and prospects. As stated above, Plaintiffs do not dispute that Bae's business concept was sound. Bae testified that the January 2012 Plan was a work in progress and its numbers and valuations were good faith "estimates." He conceded that INB did not have $8 million in working capital in 2012, and that this figure was his estimate of the amount that INB needed to begin operations. He repeatedly stated that he had at his disposal (through RB Technology and his own

---

[8] This statement leaves Fuller in the difficult position of acceding to one misrepresentation while complaining of another.

personal resources) five to six million dollars to invest in INB, and that INB closed its doors because the corporation lacked the capital (despite its investor capital, "loans" from Ara Technology, cash infusions from RB Technology, and a substantial South Korean bank loan) to finish its manufacturing facility and train its staff.[9] He also conceded that he knew, by late December 2011/early January 2012, that Israni was not interested in investing in INB, and that he did not disclose this to Plaintiffs before they invested. Bae testified that INB had nine shareholders, which included himself, Ara Technology, RB Technology, Plaintiffs, Bae's brother, Bae's cousin, and the person in charge of INB's waste management program.

Bae also testified that Plaintiffs' funds were used by INB. The bank records introduced into evidence could not fully substantiate his testimony. Most of the Plaintiffs' investments were deposited into RB Technology accounts, and while RB Technology's bank records indicate that it transferred substantial funds to South Korean bank accounts, there was no documentary evidence indicating which entity controlled this accounts.

**Plaintiffs' § 523(a)(2) Claims**

Plaintiffs assert that Bae's misrepresentations regarding INB constituted non-dischargeable fraud and entitle them to damages. Section 523(a)(2) recognizes two separate forms of actionable fraud/misrepresentation: under § 523(a)(2)(A), claims obtained by false pretenses, false representations, or actual fraud are non-dischargeable, so long as they do not arise from a "statement respecting the debtor's or an insider's financial condition." If the latter is at issue, the claim falls under § 523(a)(2)(B), which requires a plaintiff to demonstrate that their claim arises from a materially false *written* statement respecting the debtor's or an insider's financial condition which they reasonably relied on to their detriment.

---

[9] The court takes judicial notice under Federal Rule of Evidence 201 that RB Technology filed its own no-asset Chapter 7 in July 2017. _____.

Plaintiffs collectively testified that they relied on the January 2012 Plan's statements regarding the very presence and identity of Israni as an investor, director, and advisor *and* his allegedly substantial investment in the company. At the very least, any claim regarding the veracity of Israni's investment falls under § 523(a)(2)(B). *See* 11 U.S.C. § 101(31)(A)(iv); *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752 (2018). Regrettably, Plaintiffs' complaint, trial brief, and this court's Pre-Trial Order did not disclose that Plaintiffs intended to pursue a § 523(a)(2)(B) claim for relief. Plaintiffs made this request for the first time in their post-trial brief (which this court addressed during its August 5, 2022 law and motion calendar).

The Plaintiffs' request to amend the pleadings to include a § 523(a)(2)(B) claim is **GRANTED**. Federal Rule of Bankruptcy Procedure 7015(b)(2) provides

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Bae did not object to the introduction of any evidence regarding Israni's purported investment and the other financial information and representations contained in the January 2012 Plan, and he fully addressed Plaintiffs' allegations in his direct and cross-examination testimony. Accordingly, the court will address both Plaintiffs' §§ 523(a)(2)(A) and (a)(2)(B) claims for relief.

Plaintiffs assert that the January 2012 Plan contained two material sets of misrepresentations: the presence of Israni as an INB investor, director, and advisor, and INB's capitalization, which included Israni's allegedly substantial equity investment. Only the former is potentially non-dischargeable under § 523(a)(2)(A). Statements respecting the debtor's or an insider's financial condition are only non-dischargeable under § 523(a)(2)(B). *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752 (2018). A statement respecting a debtor or insider's financial condition are those that have "a direct

relation to or impact" on the debtor or insider's overall financial status."[10] *Id.* at 1761. The amount of Israni's alleged investment had a direct relation to INB's overall financial status, and Plaintiffs' allegation that this misrepresentation (and the other misstatements regarding INB's capital) deceived them can only be analyzed under (a)(2)(B). Bae's misrepresentations regarding Israni's corporate presence are distinct from the size of his equity investment, and these allegations fall under (a)(2)(A).

### Plaintiffs' § 523(a)(2)(A) Claims

To establish a non-dischargeable claim under § 523(a)(2)(A), Plaintiffs must establish by a preponderance of the evidence that (1) Bae falsely represented that Israni had invested in INB and was going to serve as a principal and advisor; (2) Bae knew these representations were false; (3) Bae included them in the January 2012 Plan with the intention and purpose of deceiving Plaintiffs; (4) Plaintiffs justifiably relied on the false representations; and (5) Plaintiffs suffered damages proximately caused by the false representations. *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010). Plaintiffs have collectively and individually met their burden of proof regarding the first three elements. The evidence overwhelming establishes that Bae knew when he presented the January 2012 Plan to each Plaintiff that Israni had not and was not going to invest in INB nor serve it in any corporate capacity. Given Israni's apparent status as a successful investor in start-ups, Bae knew that associating his name (and money) with INB would make INB a more attractive investment. The more difficult issue is the extent to which each Plaintiff under § 523(a)(2)(A) relied on this representation to invest in INB.

Oravec testified that Bae told him that Israni was investing in INB even before he reviewed the January 2012 Plan, and the January 2012 Plan's contents confirmed this statement. Oravec's understanding that Israni was a significant investor is even more

---

[10] *Lamar* addressed a statement made by an individual debtor regarding his financial status; hence the Supreme Court's reference to a "debtor's" financial condition. Section 523(a)(2)(A) and (B) refer to statements regarding a debtor and an insider's financial condition. INB is an insider under Bankruptcy Code § 101(31)(a)(iv).

material given his admission that he paid little attention to the rest of the January 2012 Plan. While Oravec's investment decision was also a product of his trust in Bae's business abilities, there was no indication that Oravec would have invested in INB solely due to his friendship with Bae. Oravec substantially relied on this representation when he decided to invest in INB.

Bae contends that the January 2012 Plan's inconsistencies prevented Oravec from justifiably relying on its contents. He argues that its misstatements (excerpts of which may be found in Bae's Post-Trial brief, filed on June 30, 2022) created "red flags" regarding the veracity of the entire document. The court disagrees. Justifiable reliance is a subjective test, and Oravec persuasively testified that he relied on Bae's and the January 2012 Plan's representations regarding Israni's alleged role with INB. Simply, Bae has not demonstrated that the falsity of these misrepresentations was or should have been readily apparent to Oravec. *See In re Kirsh*, 973 F.2d 1454, 1460 (9th Cir. 1992); *see also* Collier on Bankruptcy ¶ 523.08 (Richard Levin & Henry J. Sommer eds., 16th ed.). Bae never informed Orvaec before he invested that Israni had no interest in INB, and while the January 2012 Plan certainly contained several holes regarding its management team and inconsistent statements regarding the timing of certain milestones, the January 2012 Plan's blanket representation that Israni was a significant investor and advisor was not an averment subject to future determination. Instead, it was an unambiguous statement of existing fact which was not true, and Ovarec had no reason to question its accuracy. Oravec is entitled to an $85,000 non-dischargeable judgment under Bankruptcy Code § 523(a)(2)(A).

Kim reviewed the January 2012 Plan in November 2012 and invested $300,000.00 in January 2013 based upon several factors, including the identity of Israni as a substantial investor, Bae's offer to install Kim as Ara Technology's CEO, and INB's apparent progress on building and equipping its manufacturing plant.[11] He, too, had no reason to question

---

[11] Kim also testified that he was impressed by the amount of Israni and Bae's

the January 2012 Plan's representation that Israni owned 40% of INB.  Bae argues that Kim invested these funds so that he could return to South Korea (where he had family) and become Ara Technology's CEO.  This court does not question that these factors played a role in Kim's decision to invest in INB, yet it disagrees with Bae's premise that these facts alone control.  This court does not believe that Kim invested $300,000 simply to become a CEO, and Bae cannot untangle the two companies' prospects.  Ara Technology's future was directly dependent on INB's success, and Kim's decision to become CEO was therefore influenced by his belief that INB would prosper.  Despite this, Kim has not demonstrated by a preponderance of the evidence that he was defrauded by Bae.  Several facts convinced Kim to invest in INB, and he has not convinced this court, by a preponderance of the evidence, that he would not have invested if he had known that Israni was not a principal and an advisor.  After Kim moved to South Korea, he regularly met with Bae to discuss Ara Technology and, tangentially, INB.  Kim testified that Bae compelled Ara Technology to transfer funds to INB, and that Bae ran INB into the ground.  Yet, despite his concern regarding INB's finances and operations, there was no evidence that Kim ever inquired into Israni's status with INB, questioned the absence of his guiding hand., or begrudgingly accepted that Israni had never invested in INB and that Kim (and the other Plaintiffs) had to make the best of it.  Absent some additional, tangible evidence that Kim relied on the January 2012 Plan's statements regarding Israni's corporate presence, the court cannot find in Kim's favor.[12]

Fuller is also not entitled to a non-dischargeable judgment against Bae under Bankruptcy Code § 523(a)(2)(A), but for different reasons.  Fuller invested in INB because he believed that it was a sound business idea that was - based on the January 2012 Plan's

investments, and by Bae's representation that INB was worth $15 million. These representations relate to INB's financial condition and cannot form the basis of a 523(a)(2)(A) claim.

[12] To the extent that Kim asserts that Bae defrauded him regarding the duties of his CEO position, Kim failed to introduce any evidence regarding what representations Bae made regarding his CEO position.  In addition, Bae disputed Kim's assertions that Kim did not control Ara Technology's finances.

representations - sufficiently capitalized. These representations go to INB's financial condition, and thus fall under § 523(a)(2)(B).

### Plaintiffs' § 523(a)(2)(B) Claims

Under Bankruptcy Code § 523(a)(2)(B), a claim is non-dischargeable if it arises from the use of a written statement "(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money . . . reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." Only Fuller has a § 523(a)(2)(B) claim for relief that requires serious scrutiny. Oravec testified that his investment strategy was essentially to trust Bae and follow Israni, and he paid scant attention to the January 2012 Plan's financial information and projections. Kim testified that he was persuaded, in part, to invest in INB due to Bae's statement that INB was worth $15 million dollars.[13] The court understood Kim to mean that Bae orally conveyed this information to him. If so, this statement, if false, cannot form the basis of a § 523(a)(2)(B) claim for relief.

Fuller demonstrated by a preponderance of the evidence that Bae's use of the January 2012 Plan defrauded him. The January 2012 Plan's representations regarding Israni's substantial investment in INB and INB's overall working capital were materially false statements regarding INB's financial condition, and Fuller reasonably relied on these written representations. Simply, Israni never "heavily invested" in INB, and INB was left to rely on a handful of investors for its capital.[14] Bae owned 70% of INB, and while he testified that he invested five to six million dollars into the company, he presented no documentary evidence to substantiate this amount. Indeed, no one provided this court with any documentary evidence of the balance(s), at any time, of INB's bank account(s). In addition, Bae testified that INB did not have eight million dollars in capital in January

---

[13] Kim also stated in passing that he had scrutinized the January 2012 Plan's financial trends. He did not, however, specifically identify which financial trends he examined.

[14] Exhibit I indicates that INB had nine shareholders.

2012.  To establish materiality and reliance, a "creditor opposing discharge must explain why it viewed the debtor's false representation as relevant to the decision to extend money." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018).  A finding of "reasonable reliance" moreover focuses on whether a hypothetical average person would have relied on these representations.  Collier on Bankruptcy ¶ 523.08 (Richard Levin & Henry J. Sommer eds., 16th ed.); *see also Field v. Mans*, 516 U.S. 59, 76 (1995).  Fuller meets these tests.  Fuller clearly stated that he invested because INB had enough capital to build its facility and commence production.  In addition, given Bae's experience in the field and his CEO position with RB Technology, the hypothetical reasonable person would have believed Bae's representations regarding Israni's investment and INB's working capital totals.

No one disputes that the January 2012 Plan was imperfect.  But its imperfections were unrelated to its clear statements that Israni was a significant shareholder who had invested heavily in INB and the precise capital figures in the January 2012 Plan.  There also was insufficient evidence for this court to determine that the amount of time that passed from Fuller's receipt of the January 2012 Plan and his investment would have put a reasonably prudent person on notice to revisit these numbers.  Accordingly, Fuller is entitled to a $300,000 non-dischargeable judgment under Bankruptcy Code § 523(a)(2)(B).

**Plaintiffs' § 523(a)(19) Claims**

Plaintiffs allege that their claims are also non-dischargeable under § 523(a)(19). Section 523(a)(19) excludes from discharge (under § 727) any debt

> (19) that–
>> (A) is for–
>>> (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

> (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

> (B) results, before, on, or after the date on which the petition was filed, from—

>> (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

>> (ii) any settlement agreement entered into by the debtor; or

>> (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

To prevail on their (a)(19) claims, Plaintiffs must demonstrate that (1) there was a violation of state or federal securities law or fraud in connection with their purchase of INB stock, and (2) their claims arise from a judicial or administrative order or settlement agreement. The parties exclusively focus on the first element in their closing briefs. As more fully discussed below, Plaintiffs assert that Bae violated California Corporations Code §§ 25110, 25120, and 25130 and committed actual fraud when he induced Plaintiffs to invest in INB. The parties did not address, however, whether this court can reach these claims absent an earlier judicial or administrative order, judgment or settlement agreement arising from these securities claims.[15]

Courts are divided on whether a bankruptcy court can address § 523(a)(19) claims absent an earlier adjudication or settlement agreement. The Ninth Circuit has not addressed this issue, and at least two Circuit Courts—the Tenth and Eleventh Circuits—have held that the debt must first be memorialized in a settlement or order/judgment from a non-bankruptcy forum.[16] *See Faris v. Bahram Amir Jafari (In re Bahram Amir Jafari)*, 401

---

[15] The parties did not introduce any evidence that a nonbankruptcy tribunal had determined that Bae violated California blue sky law or committed actual fraud relating to the sale of INB stock. Because Plaintiffs limit their (a)(19) analysis to California securities law, the court will not address whether Bae violated any federal securities statute.

[16] *Tradex Global Mast Fund SPC, Ltd. v. Pui-Yun Chui (In re Chui)*, 538 B.R. 793

B.R. 494, 496 (Bankr. D. Colo. 2009); *Tripodi v. Welch*, 810 F.3d 761, 766 (10th Cir. 2016); *Creech v. Viruet (In re Creech)*, 782 Fed. Appx. 933, 938 (11th Cir. 2019). These courts rely on the legislative history and purpose of § 523(a)(19). *See In re Jafari*, 401 B.R. at 497–500 (analyzing the legislative history of § 523(a)(19), which emphasizes "that a primary purpose of this statute was to ensure that judgments and settlements from state securities fraud cases are nondischargeable without the need to re-litigate the matter in bankruptcy court").

Other courts have more broadly interpreted the code section and found that the bankruptcy court itself can be the instigator court. *See Tradex Global Mast Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui)*, 538 B.R. 793 (Bankr. N.D. Cal. 2015); *One Longhorn Land I, L.P. v. Presley*, 529 B.R. 755, 761–62 (C.D. Cal. 2015); *Williams v. Sato (In re Sato)*, 512 B.R. 241, 252 (Bankr. C.D. Cal. 2014); *Floyd v. Hill (In re Hill)*, 495 B.R. 646, 660 (Bankr. D.N.J. 2013). These courts conclude that the express language of subsection (B), its legislative history, and policy considerations support a more expansive view. *Id.* This court is persuaded by their reasoning. The text of subsection (B) provides that "*any* judgment, order, consent order or decree entered in *any* Federal or State judicial or administrative proceeding" resulting, before, on, or after the date on which the petition was filed may satisfy subsection (B). 11 U.S.C. § 523(a)(19)(B) (emphasis added). Moreover, as discussed in *In re Hill* and *In re Sato*, BAPCPA amended subsection (B) to eliminate the requirement of a pre-petition judgment. *In re Sato*, 512 B.R. at 251–52; *In re Hill*, 495 B.R. at 659–60. Finally, this court is authorized to liquidate claims in

---

(Bankr. N.D. Cal. 2015) held that (a)(19) liability is not dependent on a prior securities violation judgment and that a bankruptcy court's non-dischargeability judgment satisfies (a)(19)(B). The bankruptcy court's decision was affirmed by the Ninth Circuit Bankruptcy Appellate Panel and the Ninth Circuit. *See Tradex Glob. Master Fund SPC LTD v. Chui*, 702 Fed. Appx. 632 (9th Cir. 2017). However, the issue on appeal before the Ninth Circuit was whether the Bankruptcy Court erred by not giving an SEC document preclusive effect. As to whether a prior judgment was a prerequisite under § 523(a)(19)(B), the Ninth Circuit stated, "[w]e need not, and do not, determine any other issue urged by the parties, including the question of the bankruptcy court's scope of authority to enter a new independent judgment—apart from the judgment of the non-bankruptcy tribunal—on claims based on violations of securities laws under 11 U.S.C. § 523(a)(19)." *Tradex Global Master Fund SPC Ltd.*, 702 Fed. Appx. at 634.

conjunction with determining their nondischargeability. *In re Pui-Yun Chui*, 538 B.R. at 807 (citing *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 868, 875 (9th Cir. 2005)); *see also In re Sato*, 512 B.R. at 252.

Plaintiffs argue that Bae violated the blue sky provisions in California Corporations Code §§ 25110, 25120, and 25130, and committed actual fraud in his offering to sell INB stock to Plaintiffs. As more fully discussed below, Plaintiffs contend that the stock sales were unqualified, non-exempt issuer transactions which violated California Corporations Code § 25110. They alternatively assert that if the sales were "non-issuer" transactions, Bae nonetheless violated California Corporations Code § 25130. Bae argues that these transactions did not involve "securities," and should this court find otherwise, the sales were "exempt" under California Corporations Code § 25102(f) because they were not "public" sales.

The court's Amended Pre-Trial Order contain several stipulated facts that Plaintiffs contend support their (a)(19) arguments. The parties stipulated that (1) Bae offered to sell and did sell INB securities (*i.e.* stock) to Plaintiffs without filing a registration statement with the Securities Exchange Commission; (2) No one, including Bae, applied for qualification of INB by notification, permit, coordination or otherwise; (3) No one, including Bae, filed an offering statement with the SEC for on or INB's behalf; (4) No stop order, postponement or suspension of qualification issued by the Commissioner of Business Oversight was in effect with respect to the qualification of the sale of INB stock to Plaintiffs; and (5) No INB shares were authorized to be sold in California. In addition, the Plaintiffs established at trial that the offering and sales were made in California, and that the Plaintiffs were not "accredited investors" under Regulation D of the Securities Exchange Commission. *See* 17 C.F.R. § 230.501.

Liability under California Corporations Code §§ 25110 or 25130 is premised on the sale or offering of a "security," and this court must preliminarily address whether the INB stock sales involved a security. California Corporations Code § 25019 broadly defines the

term "security," and the INB stock sales seemingly fall within its ambit.[17]   California courts, however, typically look beyond the descriptors used by the parties and examine the substance of the transaction when applying § 25019.  *People v. Figueroa*, 715 P.2d 680, 695 (Cal. 1986).  The question asked is "whether a transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the literal language of the definition." *Id.*; *see also People v. Black*, 214 Cal. Rptr. 3d 402, 411 (Cal. Ct. App. 2017).  California court apply two tests to accomplish this task: (1) the risk-capital test and (2) the federal or *Howey* test.[18]  *Black*, 214 Cal. Rptr. 3d at 411.  Generally, a transaction is a security if it satisfies either test.  *Id.* at 411–12; *see also Consolidated Management Group, LLC v. Department of Corporations*, 75 Cal. Rptr. 3d 795, 805 (Cal. Ct. App. 2008); *Reiswig v. Dep't of Corporations*, 50 Cal. Rptr. 3d 386, 391 (Cal. Ct. App. 2006); *but see People v. Graham*, 210 Cal. Rptr. 318, 320 (Cal. Ct. App. 1985) (applying only the risk-capital test).

Under the risk-capital test, the sale of securities occurs when there is "an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money." *Silver Hills Country Club v. Sobieski*, 361 P.2d 906, 908 (Cal. 1961). However, "[w]hen an investor entrusts money or other consideration to a promoter through any arrangement but retains substantial power to affect the success of the enterprise, he has not 'risked capital' within the meaning of the Corporations Securities Law." *Figueroa*,715 P.2d at 697.  As explained by the California Supreme Court, California blue sky law "was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active

---

[17] Section 25019 provides in pertinent part that "'Security' means any note; stock; treasury stock . . . ."

[18] The court shall refer to this test as the "*Howey*" test.

participation in a business venture." *Id.* at 696 (quoting *People v. Syde*, 235 P.2d 601, 603 (Cal. 1951)). The *Howey* test examines whether "a person invested his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). Similar to the risk-capital test, the test queries whether the investor had substantial power to affect the success of the enterprise and investment. *People v. Park*, 151 Cal. Rptr. 146, 152 (Cal. Ct. App. 1978). When an investment's success requires professional or managerial skill on the investor's part, and the investor has authority corresponding with his responsibility, the investment is not a security within the meaning of the securities act. *Id.* Put another way, "[a]n expectation of profits produced by the efforts of others exists when the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Black*, 214 Cal. Rptr. 3d at 411 (citations omitted).

Kim and Oravec's purchases are securities under, at the very least, the *Howey* test. Oravec was a passive investor, and he invested his money with the expectation that Bae would successfully operate and manage INB. Kim similarly invested his funds. While Kim was nominally the CEO of an affiliated company, he had no control over INB's operations, and he, too, relied on Bae's managerial and entrepreneurial skills to run INB.

Fuller's purchase of INB stock is a closer call. Fuller and Bae informally discussed the material needs and operations of a prospective PCB manufacturer before Fuller invested in INB, and the January 2012 Plan listed him as a "Material Process Advisor." Two months after he invested, Fuller became INB's vice president of manufacturing and played some role in INB's equipment purchases, staffing and training. Despite his title, Fuller's corporate responsibilities were not the "undeniably significant ones." Much of INB's equipment was purchased before he was employed by INB, and he testified (without contradiction) that Bae had near absolute control over INB's operations. In addition, Fuller was terminated by Bae by mid-2013, and INB continued to operate until December 2015.

Accordingly, this court finds that Fuller's stock purchases involved securities under the *Howey* test.

The court now turns its attention to the substance of Plaintiffs' argument. California, like all other states, regulates corporate securities transactions. Every transaction must be "qualified" under the Corporations Code or exempt from its provisions. A purchaser of stock sold in violation of these registration provisions may rescind the sale and recover their purchase price. *See* Cal. Corp. Code § 25503 (Deering 2022). California's Corporations Code "creates two major classifications of transactions [issuer and nonissuer transactions] with different exemptions being relevant to each." *Goller v. Nat'l Life of Florida Corp.*, 554 F.2d 1349, 1351 (5th Cir. 1977).

Plaintiffs first contend that the INB stock sales violated Corporations Code § 25110, which makes it unlawful for any person to offer or sell a security in an "issuer transaction" unless such sale has been "qualified" or the security or transaction is "exempted." As stated above, the parties stipulated that the INB stock sales were not qualified.[19] This court thus must determine whether the transactions were "issuer transactions" under § 25110 and if so, whether they were exempt. The Corporations Code does not define the term "issuer transaction;" instead, it defines the terms "issuer" and "nonissuer transaction," allowing this court to infer that a transaction that is not a "nonissuer" transaction is an "issuer transaction." In this instance, INB is the issuer in question. *See* Cal. Corp. Code § 25010. An issuer is a person "who issues or proposes to issue any security." *Id.* A "non-issuer" transaction is a transaction not directly or indirectly for the benefit of the issuer. Cal. Corp. Code § 25011. Section 25011 further provides that "[a] transaction is indirectly for the benefit of the issuer if any portion of the purchase price of any securities involved in the transaction will be received indirectly by the issuer." *Id.* INB sold these shares to raise capital for its operations. Accordingly, these transactions were issuer transactions. The

---

[19] Moreover, no evidence was introduced establishing that the sales satisfied the modes of qualification under Corporations Code sections §§ 25111 – 25113.

parties dedicated a significant amount of trial time attempting to establish whether INB received Plaintiffs' funds. While Bae testified that the investment funds were all used by INB, the bank records introduced into evidence did not fully demonstrate this, and Bae himself hedged on cross-examination.[20] If this evidence was introduced to establish that these sales were not issuer transactions, this pursuit was misdirected. All parties agree that the sales were meant to provide INB with badly needed capital.

Nonetheless, Bae contends that these transactions were exempt under California Corporations Code § 25102(f). California Corporations Code § 25102(f) exempts transactions from § 25110 if (1) sales of the security are not made to more than 35 persons, (2) all purchasers either had a preexisting personal or business relationship with the offeror or its officers or directors, or had financial experience where they could be reasonably assumed to have the capacity to protect their own interests in connection with the transaction, (3) each purchaser represents that the purchaser is purchasing for the purchaser's own account and not with a view to or for sale in connection with any distribution of the security, and (4) the offer and sale of the security is not accomplished by publication of any advertisement. Cal. Corp. Code § 25102(f). Bae bears the burden of proof under this code section. *See* Cal. Corp. Code § 25163 ("In any proceeding under this law, the burden of proving an exemption or an exception from a definition is upon the person claiming it."); *see also People v. Salas*, 127 P.3d 40, 48 (Cal. 2006).

Bae has met his burden. INB had nine shareholders and Bae had a personal or business relationship with each of them. INB's shareholders were Bae, RB Technology,

---

[20] The court is not implying nor inferring that Bae used any of the funds for his personal gain. Fuller and Kim's funds were deposited into a RB Technology bank account, and its bank records indicate that these funds were probably transferred to a South Korean bank account (albeit probably not an INB bank account). Given the intertwined financial affairs of RB Technology, ARA Technology and INB, it appears that these funds benefited INB. Oravec's funds took a completely different path, and Plaintiffs did not introduce any evidence that they were personally used by Bae or were not forwarded to INB. Given the equipment it purchased and the construction of its manufacturing facility, the court finds that – at the very least – a significant portion of Plaintiffs' investments were used by INB and were meant to benefit it.

Ara Technology, Fuller, Kim, Oravec, Bae's cousin, Bae's brother and a South Korean native (a "Mr. Soong") who managed INB's waste management system.  Given the speculative nature of the investment, the court finds that the investors purchased the securities for themselves without an intent to distribute them.  Finally, there was no evidence that Bae published any advertisement to attract investors. California Corporations Code § 25014 defines the act of publication as to "publicly … issue or circulate by newspaper, mail, radio or television, or otherwise disseminate to the public."  Section 25002 defines the term "advertisement" to mean "any written or printed communication or any communication by means of recorded telephone messages or spoken on radio, television, or similar communications media, published in connection with the offer or sale of a security." Cal. Corp. Code § 25002.  Bae testified that he solicited investors by discussing INB with friends, RB Technology customers and vendors, and other individuals associated with these friends, customers, and vendors.  There was no evidence that Bae used any recognized form of media to solicit or sell INB stock.  Of the investors Bae solicited, he estimated that he showed the business plan to approximately 30 people, and there was  no evidence that Bae used any recognized form of media to solicit or sell INB stock.

The court rejects Plaintiffs' argument to the contrary.  The cases cited by Plaintiffs rely on now outdated Corporations Code provisions that dwelled on the number of offerors instead of the present emphasis on the number of purchasers. *See People v. Park*, 151 Cal. Rptr. 146, 153 (Cal. Ct. App. 1978) (interpreting 10 C.C.R. § 260.102.2 which today references Cal. Corp. Code § 25102(g) and (e)); *People v. Humphreys*, 84 Cal. Rptr. 496, 498 (Cal. Ct. App. 1970) (interpreting Cal. Corp. Code § 25012(e) and the March 25, 1967 "Guidelines for Determining when Securities are Being 'Offered to the Public'" issued by the Commissioner of Corporations); *see also Sherman v. Llyod*, 226 Cal. Rptr. 495, 499 n. 4 (Cal. Ct. App. 1986) (noting that § 25102(f) was "amended in significant regard effective

1   November 1, 1986").[21]  Because Bae has demonstrated that the INB sales were exempt,

2   issuer transactions, he has no liability under California blue sky law.

3       Plaintiffs also claim that Bae's fraudulent conduct violated (a)(19).  The elements

4   of common law fraud and false representation under § 523(a)(2)(A) are identical.  *See*

5   *Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004) (listing the

6   elements of common law fraud under California law).  Accordingly, Oravec's fraud claim

7   is also non-dischargeable under § 523(a)(19).

8       Bae's fraudulent conduct under  § 523(a)(2)(B) also constitutes non-dischargeable

9   conduct under (a)(19).  As stated *supra*, Fuller demonstrated all of the elements of common

10  law fraud: The January 2012 Plan misrepresented the amount of INB's working capital and

11  the amount invested by Israni; Bae knew that these statements were false yet he included

12  them in the January 2012 Plan to induce investments; Fuller reasonably relied on them (to

13  the extent necessary, the court also finds that Fuller justifiably relied on these

14  representations); and he suffered damages as a result. *See Alva State Bank & Trust Co. v.*

15  *Flaming (In re Flaming)*, 2007 Bankr. LEXIS 4040, at *19‑*20 (Bankr. Kan. Nov. 21,

16  2007).  Accordingly, Fuller's fraud claim is also non-dischargeable under  § 523(a)(19).

17      Plaintiffs shall prepare and submit a judgment consistent with this memorandum

18  decision.

19

20                          ***END OF ORDER***

21

22

23

24

25

26

27      [21] Stated succinctly, the pre November 1986 version of § 25102(f) focused on the
    number of offerors whereas the present version of § 25102(f) only focuses on the number
28  of purchasers.

1  Case No. 19-4032 CN

2                              COURT SERVICE LIST

3

4  Recipients are ECF participants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28